Samuel Mendelsohn v. Commissioner. Hannah Mendelsohn v. Commissioner.
Mendelsohn v. Commissioner
Docket Nos. 16177, 16178.
United States Tax Court
1950 Tax Ct. Memo LEXIS 262; 9 T.C.M. (CCH) 148; T.C.M. (RIA) 50057; February 28, 1950
Murray M. Weinstein, Esq., Samuel J. Warms, Esq., and Edward Baumgarten, Esq., for the petitioners. John E. Mahoney, Esq., for the respondent. OPPER
Memorandum Findings of Fact and Opinion OPPER, Judge: Petitioners assail respondent's determination of deficiencies in income tax for the years 1944 and 1945 in the respective amounts of $45,767.60 and $37,055.33 for Samuel Mendelsohn, and $45,789.85 and $37,134.44 for Hannah Mendelsohn. The proceedings were consolidated. Petitioners failed to offer proof or argument regarding one issue and it will be deemed abandoned. The only remaining issue is whether Ruth Paula Mendelsohn, petitioners' minor daughter, was a partner with them in the Mendelsohn Speedgun Company, or whether the business income credited to her is properly attributable to petitioners. Findings of Fact *263 Petitioners are residents of New Jersey and filed their returns with the collector for the fifth district of New Jersey. Petitioners are husband and wife. In 1938 they entered into partnership under the name of S. Mendelsohn for the manufacture and sale of photographic equipment, particularly a photographic speedgun or photoflash synchronizer invented by Samuel which synchronized the light of a photoflash bulb with the opening of a camera shutter. On June 3, 1941, petitioners executed a written partnership agreement forming Mendelsohn Speedgun Company. That agreement provided, among other matters, that the capital of the copartnership might be reduced at any time upon mutual consent of both partners; that the partners were to give all of their time, attention and skill to the business; that profits were to be shared and losses sustained equally by the partners., that either partner could sign checks; and that regular books of account were to be kept, and net profits or losses were to be determined at the end of each calendar year and to be credited or charged to the partners on the books. The partnership earned the following net profits between the respective years 1938 to 1942, *264 inclusive: $23,739.77, $7,044.40, $23,918.10, $17,410.83, $75,949.46. A substantial portion of the earnings for 1942 was derived from the salvage and sale of scrap materials in the factory which were exhausted in that year and could not serve as a source of income in later years. The manufacture of synchronizers decreased sharply during 1942. Business prospects were highly uncertain in January 1943, due to the shortage of critical materials and the difficulty of obtaining war orders which would give the business priority ratings for purchasing materials. Ruth Paula Mendelsohn, daughter of petitioners, was born on July 22, 1930, and was 12 1/2 years of age on January 4, 1943. On that date petitioners executed an assignment which stated that "in consideration of natural love and affection" for their daughter, each of them transferred to her a one-sixth interest in the business. On the same day petitioners and Ruth executed a purported copartnership agreement which stated that it incorporated the provisions of the agreement of June 3, 1941. Petitioners filed gift tax returns and Ruth filed donee's information returns. Each of those returns estimated the value of a one-sixth interest *265 in the business to be $13,168.68. A certificate of partnership business name was filed with the Essex County Clerk, stating that petitioners and Ruth were partners in Mendelsohn Speedgun Company. Petitioners informed the Social Security Administration, the Unemployment Compensation Commission, their insurance companies and bank, that Ruth had become a partner. Petitioners sent no formal notification to the firms for whom they did subcontracting work, although Ruth's name subsequently appeared on legal papers. Firms dealing with the business were not informed of Ruth's age. During the year 1943, in accordance with petitioners' suggestion, Ruth withdrew from a savings bank account the sum of $3,000 which she had received as a gift from petitioners during the previous year. The money was placed in the business as a loan. No written evidence of the debt was ever made, and the money was never repaid. Subsequently, at an undisclosed date, it was agreed that the sum should remain in the business. During 1943 Ruth attended Montclair Junior High School. During 1944 and 1945 she was 14 and 15 years of age, and attended Montclair High School. She engaged in many school extra-curricular *266 activities, serving as chairman of the Red Cross, a member of the Stamps and Bond Savings Committees, and chairman of the football program, which entailed soliciting advertisements and dealing with the printers. During these years Ruth often came to the place of business on afternoons, and occasionally she did some filing or typing. Frequently she listened to business discussions by petitioners and on one occasion she made a suggestion regarding advertising which was adopted. She never exercised any dominion or control over partnership affairs, funds or bank account; she could not sign checks; she did not participate in purchasing or selling, manufacturing, or hiring and discharging employees; she had no voice in management and took no part in the conduct of the business. Throughout the periods here involved petitioner Hannah had general supervision of the records and the office and managed routine business, while petitioner Samuel was in charge of technical development and operations and obtaining business. It was due solely to the knowledge and efforts of petitioner Samuel that the business was able to procure war contracts and convert successfully to the war work which was responsible *267 for its financial prosperity in 1944 and 1945. The firm became devoted largely to the manufacture of electronic equipment as a subcontractor for other large companies. The business earned the following net income in the years 1943, 1944, and 1945, respectively: $131,225.82, $382,448.70, and $245,877.70. The partnership returns for those years reported that the income was shared equally between petitioners and Ruth. The tax return of each petitioner for each year here involved reported as taxable income one-third of the net profits of Mendelsohn Speedgun Company. The drawing account of Ruth on the books of the business shows withdrawals during these periods directed to the following purposes: Total
Savings Bank
Year
Withdrawals
Taxes
Bonds
Accounts
Personal
Realty
Charity
1943
$35,517.86
$31,000.00
$ 931.25 *
$ 3,150.00
$436.61
1944
32,082.07
16,842.44
3,712.45 *
10,700.00
752.18
$75.00
1945
28,361.38
2,325.96
3,175.00 *
17,860.42
$5,000.00
The bonds purchased for Ruth in her name were kept in a safe in the office of the partnership. The combination of the safe was not known to Ruth and she would have been *268 compelled to ask petitioners or their office bookkeeper in order to obtain physical possession of the bonds. Records purporting to contain contemporaneous entries regularly made by petitioner Hannah of all bond purchases for Ruth show purchase prices aggregating the following amounts in the specified years with the source of payment being gifts by petitioners or drawing from the business as indicated: With-
Total Pur-
Year
Gifts
drawals
chase Price
1936
$ 375.00
$ 375.00
1937
900.00
900.00
1938
900.00
900.00
1939
900.00
900.00
1940
900.00
900.00
1941
918.75
918.75
1942
7,390.00
7,390.00
1943
1,237.50
$ 900.00 *
2,137.50
1944
5,343.75
3,562.50 *
8,906.25
1945
243.75
7,987.50 *
8,231.25
The savings bank accounts in which deposits were made were in Ruth's name and the bank books were in her possession. Withdrawals against Ruth's account in the business were usually deposited directly by petitioners in the savings accounts and petitioner Hannah guided and directed Ruth regarding withdrawals of funds from those accounts. Ruth had also a checking account *269 which usually had a balance of approximately five hundred dollars during 1944 and 1945, and which she used for personal expenditures. During these years and until September 1947, when she entered Northwestern University, Ruth lived at home with petitioners. Some portion of her withdrawals from the business was used for her support. The following are the capital accounts of petitioners and Ruth shown on the books of the business at annual intervals: Total Capital
Samuel
Hannah
Ruth
Dec. 31, 1942
$ 79,012.08
$35,640.36
$43,371.70
Jan. 4, 1943
79,012.08
22,471.68
30,203.02
$26,337.36
Dec. 31, 1943
99,838.79
28,389.42
34,296.72
37,152.65
Dec. 31, 1944
134,996.22
36,490.78
43,459.09
54,746.35
Dec. 31, 1945
155,482.47
45,397.11
50,206.79
59,878.57
In 1946 the partnership was dissolved and two new corporations were formed to take over all of the assets of the business. Ruth received one-third of the stock in each of the two corporations. Petitioners did not actually intend, acting in good faith and with a business purpose, to join together with Ruth to carry on business in partnership. Opinion Petitioners' attempt to show that *270 their true intention was to enter into a partnership with their twelve-year-old daughter must we think be viewed as unsucessful. All of the aspects emphasized in , and other authorities dealing with the subject, indicate the contrary, with one possible exception. The daughter admittedly rendered no services, had no voice in partnership affairs, and could not affect the control or disposition of the partnership income. While she may have been entitled to share in the profits, it is improbable in the extreme that she could have been held for any share in losses because of her minority throughout the period in controversy. Mechem, Elements of Partnership (1920), section 49. The partnership income was largely the product of the personal services of the two petitioners, particularly of the husband, although it is noteworthy that the respondent does not here contest the validity of the partnership as far as it affects the petitioner wife. There was no change in the operation of the business before and after the "partnership" agreement, and such business purpose as is advanced deals with a hopeful anticipation for future years, rather *271 than the present. (Dec. 22, 1949). The fact that petitioners may have intended to assign to their daughter a portion of the capital of the business is not by itself sufficient. (Jan. 11, 1950). Yet that is the sole indication that a true partnership could have been contemplated. Even as to this, the function which the capital performed is questionable, and its necessity at the time of the assignment extremely doubtful in the light of petitioners' testimony. Such control as the daughter may have exercised, even over her distribution of profits, is qualified by the influence her mother understandably exerted over her conduct. See . And to some degree at least the daughter's distributions from the business were used to pay personal expenses for which petitioners were liable and would otherwise have had to pay. See . Whether a true business partnership could have existed under the circumstances we need not here decide, although a court in the state of petitioners' domicile has said: "* * * It passes belief that *272 a mother would enter into a partnership with her own children (the eldest of whom, a girl, was 16 years, and the youngest of whom was one month old), and would agree that each should have an equal share of the profits, while she, so far as they allege, was alone responsible for all the losses. "Furthermore, there was no possible consideration for such an agreement. The mother was entitled to the earnings of her children, during their minority. * * * And if they worked for her under her direction and control, they but did their duty to her, and there is therefore no possibility of importing any consideration into any such agreement as they allege was made." [.] However that may be, we think it clear that in the present case there was no actual intention on the part of petitioners to join together in a real business relationship with their minor daughter, and our finding to this effect disposes of the proceeding. , affirmed (C.C.A., 2nd Cir.), . Decision will be entered for the respondent. Footnotes
*. The discrepancies in the figures are not explained.↩